# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 26, 2011

## STATE OF TENNESSEE v. DARYL J. CARTER

**Direct Appeal from the Circuit Court for Bledsoe County**
**No. 36-2005     J. Curtis Smith, Judge**

**No. E2010-01193-CCA-R3-CD - Filed February 14, 2012**

The defendant, Daryl J. Carter, was convicted after a trial by jury of one count of rape of a child, a Class A felony. The defendant appeals his conviction, claiming that the trial court erred by denying his motion to suppress a statement made to police and by prohibiting his defense counsel from cross-examining the defendant's ex-wife concerning her love life. In addition, the defendant claims that the evidence is insufficient to support his conviction and that the prosecution engaged in misconduct during its closing argument. After reviewing the record and the arguments of the parties, we conclude that: (1) the trial court did not err by declining to suppress the defendant's pretrial statement; (2) the trial court did not abuse its discretion by limiting the defendant's cross-examination of his ex-wife; and (3) the evidence is sufficient to support his conviction. While we agree with the defendant that the prosecutor made an inappropriate statement in his closing argument, we do not believe that this inappropriate statement prejudiced the defendant to the degree necessary to warrant the reversal of his conviction. The judgment of the trial court is accordingly affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, J., joined. DAVID H. WELLES, SP. J., not participating.

Philip A. Condra, District Public Defender, and B. Jeffrey Harmon, Assistant Public Defender, for the appellant, Daryl J. Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was indicted on July 25, 2005, in Bledsoe County, Tennessee, on one count of rape of a child in violation of Tennessee Code Annotated section 39-13-522(a). The gravamen of the indictment was that on January 10, 2005, the defendant intentionally sexually penetrated the victim,[1] his two-year-old adopted daughter.

Prior to trial, the defendant moved to suppress certain statements that he made to police on April 20, 2005, on the grounds that they were obtained in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and their counterparts contained in the Constitution of Tennessee. The defendant claimed that these statements – made following a polygraph examination – were obtained after he asserted his right to counsel and that the police continued to interrogate him following this assertion. In addition, the defendant claimed that he gave his statements to the police and provided them with a drawing of his hand only after having been falsely promised that he would not be arrested and that, after undergoing counseling, he would be reunited with his family. The defendant claimed that the statements he gave were involuntary because he relied on these false promises. On February 27, 2006, the trial court held a hearing on the defendant's motion to suppress, at which the following evidence was presented:

The State presented the testimony of Special Agent Malcolm Elrod of the Tennessee Bureau of Investigation ("TBI"). Agent Elrod testified that he had been employed with the TBI since 1994, and that, prior to that time, he was a criminal investigator for the United States Army for twenty years. Agent Elrod testified that he was a licensed polygraph examiner and that his duties primarily related to performing polygraph examinations. Agent Elrod testified that he performed a polygraph examination on the defendant on April 20, 2005, at the Bledsoe County Sheriff's Office. He testified that he met and spoke with the defendant for approximately forty-five minutes before performing the exam. He testified that, during this time period, he introduced himself to the defendant and advised him of his *Miranda* rights. He also had the defendant complete a personal information form, a waiver of his *Miranda* rights, and a polygraph consent form. These forms were shown to the witness and then entered into evidence. Afterward, Agent Elrod testified that he generally explained the polygraph process and went through all the questions he was going to ask the defendant.

Agent Elrod testified that after finishing these preliminaries, he administered a

---

[1] It has been our policy to refer to the child victims of sex offenses by their initials. In this case, we have decided to protect the identity of the victim further by omitting her initials. We will refer to the victim simply as such, and identify members of the victim's family only by their relationship to her.

polygraph examination to the defendant. He analyzed those answers and produced a report based on the examination that he administered. According to Agent Elrod, the defendant showed deception with respect to three answers. The witness then identified his report, and that report was entered into evidence. Agent Elrod testified that after completing the examination, he told the defendant that he did not believe that the defendant was being truthful and that he believed that something had happened between the defendant and his daughter. After being told this, Agent Elrod testified that the defendant admitted that he had, in fact, put his finger inside the victim's vagina.

Agent Elrod testified that he traced the defendant's hand onto a piece of paper and had the defendant identify the portion of his hand that had entered into the victim's vagina on that tracing. Agent Elrod identified this tracing, and it was entered in the evidence. Agent Elrod testified that the tracing contained a line that showed how far the defendant claimed that he had stuck his middle finger into the victim's vagina and a notation stating that the defendant claimed that his finger was inside the defendant's vagina for four or five seconds. The drawing was signed by the defendant.

Agent Elrod testified that, during this period of time, the defendant appeared to be remorseful but also upset at "having to say out loud" what he had done. Agent Elrod testified that he did not issue any threats or make any promises to the defendant at any point before, during, or after administering the polygraph. Agent Elrod also testified that the defendant never requested a lawyer or asked that anyone contact his lawyer. Agent Elrod testified that Investigator Seals, an officer with the Bledsoe County Sheriff's Office, came into the room at some point after Agent Elrod and the defendant finished working on the drawing. Agent Elrod testified that he left when Officer Seals came into the room.

On cross-examination, Agent Elrod testified that although he describes himself as a neutral agent when he administers a polygraph examination he actually administers polygraph examinations for the purpose of helping law enforcement. He testified that his purpose on that day was not to interrogate the defendant and that, if the defendant had passed the test, he would not have interrogated him. Agent Elrod testified that he is trained in the art of interrogation and that once he concludes that a test has indicated deception, he considers himself to no longer be neutral, but an interrogator. Agent Elrod stated that at no point before, during, or after the examination did he ask the defendant if the defendant would like to have someone in the room as a witness.

Agent Elrod testified that a polygraph examination is a subjective evaluation but that his conclusion that the defendant was being deceptive was based entirely on the subject's skin galvanization as recorded by the machine and not on anything he observed about the defendant personally during the interrogation. Agent Elrod testified that only three relevant

questions were asked during the entire examination and that all of the other questions that he asked during the examination were used solely for comparison purposes. Agent Elrod clarified that these three relevant questions were ones on which his analysis indicated that the defendant was practicing deceit with respect to his answers.

Agent Elrod testified that after he informed the defendant that he believed the defendant was practicing deception, they had a conversation that lasted for about forty-five minutes. In this conversation, he stressed to the defendant that he needed to tell the truth regarding what had happened to the little girl. Agent Elrod testified that roughly ten to fifteen minutes after he confronted the defendant regarding his test results, the defendant admitted that he digitally penetrated the victim. Agent Elrod testified that the defendant did not ask for an attorney at any point during this time. Agent Elrod testified that it was TBI policy not to videotape or record polygraph examinations and that the examination and his subsequent interview with the defendant were not videotaped or recorded. Agent Elrod testified that he could not recall if the defendant had ever asked him whether or not he would go to jail or whether or not his children would be returned to him.

On redirect examination, Agent Elrod testified that he was not wearing a uniform or carrying a gun on the day in question and that the atmosphere before, during, and after the examination was very congenial. Agent Elrod testified that it is his policy to end a polygraph examination if a subject mentions to him that he wants a lawyer. On recross-examination, Agent Elrod testified that if a subject asks him whether or not he thinks they need a lawyer during the polygraph examination, it is his policy to state that the decision is entirely up to the person asking the question and that he cannot assist the person in making that decision. Agent Elrod testified that the defendant asked no such question during his examination.

After receiving Agent Elrod's testimony, the court concluded its hearing on the defendant's motion to suppress and continued proceedings. At a preliminary hearing on March 6, 2006,[2] the trial court took additional evidence that was relevant to the defendant's motion to suppress.

The State presented the testimony of Investigator Ricky Seals of the Bledsoe County Sheriff's Department. Investigator Seals testified that on January 14, 2005, he began an investigation concerning a possible rape of a two-year-old child. On that day, Investigator Seals interviewed the defendant – who was married to the victim's mother – at their residence in Brockdale. Investigator Seals testified that the defendant was not in custody at

---

[2] The record reflects that the defendant was afforded this additional preliminary hearing (held outside of its normal sequence in the criminal process) because there was some difficulty concerning the transcript from an earlier proceeding.

the time. During this initial interview, Officer Seals testified that he asked the defendant what had transpired on January 10, 2005. The defendant essentially responded that he did not know what had happened to the victim. Some weeks later, Investigator Seals scheduled a polygraph examination for the defendant, and that examination was conducted on April 20, 2005, at the Bledsoe County Sheriff's Department. Officer Seals testified that the defendant showed up voluntarily to the examination, which was performed by Agent Elrod of the TBI.

Officer Seals testified that following the polygraph examination, he was informed that the defendant wanted to give him a statement. Officer Seals testified that prior to giving that statement, the defendant was not in custody and was free to leave at any time. Officer Seals testified that prior to receiving a statement from the defendant, he read the defendant his *Miranda* rights. He testified that the defendant executed a written waiver of those rights. Officer Seals testified that, afterward, the defendant gave him a statement in which he claimed that he had been changing the victim's diaper when the two of them ended up wrestling around, that "one thing led to another, and I stuck my middle finger in [the victim's] vagina area for second, and only down to the first knuckle, and immediately removed it, and I did not get an erection or anything." The defendant further stated that he picked up the victim and told her that he was sorry and that he loved her. Officer Seals testified that the defendant stated that he did not know what came over him and that he became scared and decided to tell the victim's mother that he did not know what had happened to the victim. Officer Seals testified that the first portion of the defendant's confession was written in his own handwriting, and the second portion of the confession was written by the defendant. He testified that the defendant signed the confession after both sections.

Officer Seals testified that prior to his entering the room, a diagram of the defendant's hand had been made by the defendant and Agent Elrod. A copy of the defendant's written statement, his executed *Miranda* waiver, and that diagram were identified by Officer Seals and entered into evidence. Officer Seals also identified the defendant in open court as the man who had given the written statement and made the diagram indicating that he had penetrated the two-year-old child.

On cross-examination, Officer Seals testified that he did not go to the hospital on the night of the incident. He testified that he was contacted by the Department of Children's Services ("DCS") in the early hours of that morning and did not meet with the defendant until later on. He testified that when he was contacted by DCS, he was informed that a child was going in for emergency surgery. He was later contacted by DCS and informed that the child had come out of the surgery "okay," and that DCS had requested that the defendant no longer participate in visitations with the children. Officer Seals testified that with respect to possible suspects other than Mr. Carter, he interviewed four or five other people, mostly

immediate family members. Officer Seals testified that he contacted Agent Elrod about performing a polygraph examination at some point during his investigation and that he asked the defendant and his wife to take such examinations. Officer Seals testified that he was not present when the examination was administered but that at some point Agent Elrod sought him out and told him that the defendant wanted to make a statement about what had taken place.

Officer Seals testified that the defendant did not draw the diagram of his hand in his presence. He testified that he was unaware of any conversation that may have occurred between the defendant and Agent Elrod prior to his entering the room. Officer Seals testified that he had attended several preliminary hearings and child custody hearings involving the defendant. He testified that he was aware that the treating physicians had described the victim's injuries on the night of the incident as severe and was aware that one physician had described the victim's vaginal area as appearing like "ground up hamburger meat." Officer Seals testified that the defendant's statement made no mention of bruises around the victim's neck or ears, and that he did not question the defendant about those injuries.

Officer Seals testified that after he took the defendant's statement, the defendant made a statement to the effect of "I don't know how to tell [the victim's mother]." Officer Seals testified that he told the defendant that he would go get the victim's mother and allow the defendant to tell her. He testified that he brought in the defendant's wife from another office and took her to where the defendant was located. He testified that he sat at his desk and told the defendant's wife that the defendant had something to tell her. He testified that the defendant began crying and told his wife that he had done something to her daughter but was scared and did not know how to tell her what had happened. He testified that following these statements the defendant and his wife cried for a few minutes, and then the defendant's wife got up and told the defendant that she loved him. Officer Seals testified that after this occurred, he explained to the defendant that he would be charged. On the following day, he took out a warrant against the defendant for the rape of a child.

Following this testimony, the trial court found probable cause to exist and the proceedings for the day were concluded. On March 16, 2006, the court held yet another hearing at which the defendant testified concerning issues relevant to his motion to suppress. The defendant testified that he voluntarily spoke with Officer Seals for approximately an hour on January 15, 2005. During this interview, the two generally discussed various questions concerning an injury that had been suffered by his adopted daughter. The defendant testified that, during that interview, he told Officer Seals that he had no knowledge concerning how the victim had been injured.

The defendant testified that he contacted an attorney, Mr. Keith Grant, as soon as he

learned that the children were going to be removed from his home. He testified that he retained Mr. Grant's services for purposes of the adjudicatory hearings concerning the victim as well as a second child that he had with the victim's mother. He testified that he had married the victim's mother on February 10, 2004, and had adopted her daughter soon thereafter.

The defendant testified that Officer Seals called on April 19, 2005, and requested that he take a polygraph examination. The defendant stated that he consented to take such an examination on the following day. The defendant stated that he showed up for his exam around 10:00 a.m. and was introduced to Special Agent Elrod. He testified that Special Agent Elrod asked him a number of preliminary questions, including what he expected to gain from taking the polygraph. The defendant claimed that he told Agent Elrod that he hoped to get his children returned back home. The defendant testified that the polygraph examination itself lasted approximately twenty minutes.

The defendant testified that after the test was over, he asked Agent Elrod how he had done. He testified that Agent Elrod told him that there was only one answer that concerned him, and that was his answer to the question of whether or not the defendant knew what had happened to the victim. The defendant testified that he told Agent Elrod that the "only thing he could figure" was that he had injured the victim while cleaning up a dirty diaper. The defendant testified that Agent Elrod told him that he believed him.

The defendant testified that Agent Elrod told him that he would not go to jail if he would just tell him what had happened. Instead, the defendant would simply have to undergo counseling, and the children would be allowed to come home – although he would have to move out. The defendant testified that immediately prior to Agent Elrod telling him that he would not have to go to jail, he stated to Agent Elrod that "well, I want to talk to my attorney." The defendant testified that Agent Elrod asked him why, to which the defendant replied that he did not want to go to jail. The defendant testified that Agent Elrod then responded that he would not go to jail and that he would have to move out of the house but would be permitted to have supervised visitations with his children while undergoing counseling.

The defendant testified that Agent Elrod told him that he needed to talk to Officer Seals. The defendant testified that Agent Elrod asked him to put his hand on a piece of paper and traced around it, and then asked the defendant "which finger?" The defendant testified that he told Agent Elrod that it was his middle finger. When Agent Elrod asked him how far inside of the victim his finger had gone, the defendant told Agent Elrod to the end of his fingernail – but Agent Elrod marked the diagram to reflect that the defendant's finger had entered the victim all the way up to the end of his knuckle. The defendant testified that

Agent Elrod made all of the markings appearing on the diagram – including both arrows, the line across the finger, and the written phrase "[four to five] seconds." After doing so, Agent Elrod informed the defendant that he was going to bring in Officer Seals, and instructed the defendant to tell Officer Seals everything they had discussed.

The defendant testified that when Officer Seals arrived, Agent Elrod left the room. The defendant testified that he told Officer Seals that he thought what had occurred was an accident but that he did not know for sure. He testified that Officer Seals informed him that it did not matter whether what had it occurred was "an accident, forcible entry, or neglect of the parent, it was still rape."

While on the witness stand, the defendant was shown and reviewed a copy of the written statement that Officer Seals had testified that the defendant had given to him on that day. The defendant testified that the words appearing on the statement were not words that he had spoken to Officer Seals during his interrogation. The defendant did acknowledge that he had been given his *Miranda* warnings, had read his statement, and had signed it. The defendant testified that he did so only in order to get his children back. He also testified that he did not want for his wife to be separated from her children and made a point of telling the officer that she did not have anything to do with what had transpired. He wrote words to this effect on the bottom of his written statement to make sure they were included.

On cross-examination, the defendant acknowledged that he had voluntarily spoken with Officer Seals on January 14, 2005, and that he had not retained counsel at that time. The defendant testified that he told Officer Seals at that time that he thought the child was bleeding from some sort of diaper rash. The defendant acknowledged that he agreed to undertake a polygraph examination during this interview. The defendant testified that after this interview he retained an attorney and that he and his attorney attended several depositions taken by doctors who treated his daughter at the hospital on the night in question. He testified that he discussed the issue of taking a polygraph examination with his attorney and that his attorney advised him not to take it. The defendant testified that his attorney communicated to Officer Seals that the defendant did not want to take a polygraph examination. The defendant testified that he later approached Officer Seals after one of the depositions and told him that he would be willing to take a polygraph examination.

The defendant testified that it was his decision whether or not to take the polygraph examination. The defendant testified that prior to taking the examination he read, understood, and signed a form waiving his *Miranda* rights. The defendant acknowledged that he was asked three questions in the polygraph examination: (1) "Did you put anything in [the victim's] butt?" (2) "Did you put your penis in [the victim's] vagina?" and (3) "Have you ever fondled [the victim] for sexual gratification?" The defendant testified that he

answered "no" to each of these three questions. The defendant testified that Agent Elrod never told him that he was practicing any type of deception with respect to any of the answers to those questions. The defendant testified that he had no reason to change the story that he had told Officer Seals other than the fact that he believed that his children were being neglected by his wife's father (the person in whose care DCS had placed his children). He testified that when Agent Elrod told him that he would not have to go to jail, that his wife would get the children back, that he would only have to go to counseling and serve probation, and that he would be reunited with his family, he decided to take the deal.

The defendant further testified on cross-examination that he decided to ask for an attorney when Agent Elrod mentioned that he had concerns about one question because Agent Elrod was making him feel uncomfortable. He testified that Agent Elrod told him that he did not believe the defendant had done anything wrong but that the defendant was just a "dumb twenty-one year-old kid." He testified that when he told Agent Elrod that he wanted an attorney because he was afraid of going to jail, Agent Elrod told him that "the only way you're going to jail is if you hit me." According to the defendant, after Agent Elrod told him about the deal, he and Agent Elrod reviewed what he was supposed to say to Officer Seals, because Agent Elrod told the defendant that Officer Seals would not accept the defendant's statement that it was all an accident as a confession. The defendant testified that his written "confession" was simply a repetition of comments fed to him by Agent Elrod and that he decided to adopt Agent Elrod's statements as his own even though he knew they were lies. The defendant testified that Agent Elrod traced the defendant's hand all by himself, and that Agent Elrod wrote down the words "[four to five] seconds" on that diagram even though the defendant had never said anything to him about four or five seconds. The defendant testified that Agent Elrod made other embellishments to the diagram. The defendant testified that he did not sign the diagram until Officer Seals brought the diagram back to him and had him sign it. According to the defendant, the only thing on the diagram that was his was his signature.

The defendant stated that he signed the statement even though it was a lie because he was concerned that his kids were being neglected by their caretaker. He testified that he had heard that his daughter was not being taken to the hospital at times when she was supposed to be taken and that his son was being whipped even though he was only seven months old. The defendant testified that after he signed the written statement, his wife came in, and he told her that he thought he might have accidentally scratched the victim. He testified that while Officer Seals was in the room, he told his wife that Agent Elrod had told him that he was not going to go to jail and that she would get the children back. The defendant testified that his wife then asked Officer Seals when she would get the children and that Officer Seals replied that it would probably be two or three weeks, depending on how long it took for the paperwork to go through. The defendant testified that he never asked Officer Seals for a

lawyer and that he never told his wife that the police officers would not let him talk to a lawyer.

On redirect examination, the defendant testified that the Department of Children's Services had discussed with him the possibility of his reunifying with his children and had given him a list of goals that must be accomplished first. These goals included fixing a couple of light fixtures in their home and taking a parenting class. The defendant testified that he did all of the things DCS required him to do because he was trying to cooperate and get his children back. The defendant testified that at the conclusion of his polygraph examination, Agent Elrod kept reminding him of the fact that he wanted to get his children back home and told him that the only way to do it was to basically "stand up," "be a man," and "do something about it." The defendant testified that Agent Elrod told him that the only option the defendant had was to "get the whole case over with" so the children could go home. The defendant testified that he loved, would lie, and would die for his children.

On re-cross-examination, the defendant stated that Agent Elrod told him that the only reason he was there that day was to obtain the defendant's confession. After taking this testimony from the defendant, the hearing was concluded.

On May 17, 2006, the trial court issued an order overruling the defendant's motion to suppress. The trial court found as a factual matter that the defendant's version of events was not credible. The trial court emphasized that even after Agent Elrod left the room, the defendant never told Officer Seals or his wife that any coercion had occurred. In addition, at the time he made his confession, the defendant was well aware of the serious injuries his daughter had suffered and was aware that his children would not be returned without court approval. The trial court found as matters of fact that no request for counsel had been made, that no story was supplied to the defendant by Agent Elrod, and that the defendant's incriminating statements had not been coerced, but rather had been freely and voluntarily given.

The defendant was tried before a jury on May 20-22, 2008. At his trial, the following evidence was presented:

The State's first witness was Ms. Mary Spada, a pediatric nurse practitioner at the T. C. Thompson's Children's Hospital in Chattanooga. Nurse Spada testified that she performed medical exams for the Children's Advocacy Center, an organization whose purpose was to perform medical examinations on children that may have been the victims of sexual abuse. The witness testified that she performed an examination of the alleged victim in this case and that she performed such examinations on several hundred children each year.

The witness testified that when she first saw the victim, she was being put under general anesthesia because she was bleeding from her genital area and that bleeding would not stop. The witness testified that she watched the operating physician remove a large blood clot from the victim's vaginal area and that, afterward, significant additional bleeding occurred. The witness testified that she carried a rape kit with her and collected evidence from the victim following the victim's surgery. The witness testified that while the victim was under general anesthesia, she viewed the child's genitalia with an optical magnifying lens and was able to see at least two cuts between the victim's labia and in the surrounding vaginal area. She said that she could see inside the victim's vagina and that this area appeared very red, bloody and abraded-looking. The witness testified that the victim was still bleeding from the injury during the surgery and that blood started to pour out of the victim's vagina when the blood clot in the area was disturbed.

Ms. Spada testified that the victim had injuries to areas other than her vagina, including severe bruises on the top of her ears. She testified that this bruising was particularly intense – a bright red and purple color – which she considered remarkable. She testified that the victim also had a mark on her right cheek that was circular in nature and a circular bruise to her lower back. She testified that the victim's neck displayed some slight bruising and had many broken blood vessels. The witness testified that she took several photographs of the victim while the victim was in the operating room. The witness authenticated these photographs, and they were entered into evidence. The witness testified that based on her experience, bruises of this nature – which displayed no yellow or green coloration indicative of healing – would probably have occurred within the last twenty-four hours. The witness testified that it was her opinion that all of these injuries are likely sustained contemporaneously.

Nurse Spada testified that the victim had markings from an old diaper rash in her buttocks area underneath the soft tissue. She further testified that diaper rash could not cause the kind of bleeding that she witnessed on the night in question.

Nurse Spada testified that based on the injuries she saw that night, she felt that it was necessary to administer a rape kit on the victim, notwithstanding the fact that she had some concern about performing her task on the victim in light of how much bleeding was occurring. The witness testified that the injuries she saw were consistent with sexual assault. The witness testified that, in her opinion, the victim's injuries could only have occurred by the penetration of the victim's vagina by an object. She testified that based on the nature of the tears to the victim's vaginal area, she was able to conclude that the object that had penetrated the victim's vagina was larger in diameter than the victim's vaginal area. The witness testified that, based on her training and experience, she held the opinion that a penis could have caused the injuries she saw on the victim. She testified that it would also have

-11-

been feasible for the injuries she saw on the victim to have been caused by a finger, but specified that it would have to have been a large finger – one with a wide bore exerting a lot of pressure – to cause the kind of injury she saw on the victim. The witness testified that in her years of experience in dealing with juvenile sexual assault victims, the wound to the victim's genital area could be fairly described as large.

After administering the rape kit on the victim, the witness testified that she turned the kit over to Officer Ricky Seals for submission to the lab. The witness testified that in her experience it was not possible for a two-year-old child to injure her own genital area to such an extent by herself. The witness testified that the wounds suffered by the victim would have been very painful.

On cross-examination, the witness testified that the victim was not crying or acting agitated at the hospital, but rather was lying quietly on a stretcher when she arrived. The witness also agreed that it was possible that not all of the victim's injuries occurred simultaneously. The witness testified that her examination revealed that the portion of the victim's hymen that could be observed around the victim's blood clot was still intact. The witness testified that she could not determine whether the victim's hymen had been disrupted because the victim's blood clot was obscuring her view of a portion of the victim's vagina. The witness also testified that it was normal for genitalia to differ from person to person and that each vagina looks a little different.

On redirect examination, Nurse Spada testified that having an intact hymen did not preclude someone from having been the victim of a sexual assault that included either penile or digital penetration. The witness testified that the absence of a hymen, in her experience, meant that a sexual assault that occurred. The witness testified that, on the night of the incident, she took a history report establishing a time line with respect to the child's activities for the preceding forty-eight hours. The witness testified that she prepared this report by talking to the victim's mother, because the victim's father was not present when the history was taken. Nurse Spada proceeded to read this report to the record. Nurse Spada further testified that the injuries she saw on the victim on the night in question were inconsistent with the kind of injuries that might occur from children roughhousing with each other.

The State's next witness was Jennifer Millsaps, a special agent forensic scientist with the Tennessee Bureau of Investigation. Ms. Millsaps testified that she worked in the serology and DNA unit, analyzing evidence for the presence of bodily fluids such as blood, semen, or saliva. Ms. Millsaps testified that she received a sample of material from Detective Ricky Seals of the Bledsoe County Sheriff's Department. This material was hand-delivered to her and represented to her as coming from the victim. The witness testified that she tested various evidence that was in the rape kit, and that this evidence included a

blood sample from the victim, vaginal swabs and vaginal slide, anal swabs, oral swabs, and a labial swab. The witness testified that she examined the vaginal swabs and that her examination revealed the presence of a limited amount of spermatozoa.

The witness testified that if any mistakes had been made with respect to the steps taken to preserve the material from the rape kit, those problems would not lead to a false positive with respect to the presence of spermatozoa. Instead, those problems would make it less likely that any spermatozoa would be discovered in the sample. The witness testified that she did not discover anything in the victim's anal swabs, oral swabs, or labial swabs. The witness testified that she attempted to have DNA testing done on the spermatozoa discovered in the victim's vaginal swab by sending that sample to a private laboratory in Virginia, but that this laboratory was unable to extract any DNA from the sample in light of the limited amount of spermatozoa present. The witness testified that washing the area of a person's body where sperm had been deposited could result in a decrease in the amount of spermatozoa that was present in that area.

On cross-examination, the witness testified that she did not discover any spermatozoa on the vaginal slide taken from the victim at the hospital. The witness testified that it can be difficult to locate and confirm the presence of spermatozoa on these sorts of slides. The witness testified that she discovered a total of six individual spermatozoa by preparing a slide from a cutting of the victim's vaginal swab. She testified that the tails were missing on the six spermatozoa. She testified that she performed a preliminary examination to test for the presence of semen (the liquid which carries spermatozoa out of the male body) on the cutting that she took from the victim's vaginal swab and that the swab tested negative for the presence of semen. The witness testified that the slide that she had taken of the cutting of the victim's vaginal swab had subsequently been destroyed. Consequently, there was no way for a third party to reexamine the slide. The witness testified that the vaginal swab and the smear from the victim's rape kit were used up by the independent laboratory in their attempt to perform a DNA test.

Following Ms. Millsaps' testimony, the State called Special Agent Malcolm Elrod of the Tennessee Bureau of Investigation to the stand. While on the stand, Mr. Elrod made no reference to his performing a polygraph examination on the defendant, and testified only to the interrogation that followed. His testimony in this regard was similar to that given at earlier hearings and summarized above.

On cross-examination, Agent Elrod testified that he had been trained in tactics of interrogation and how to testify in court. The witness testified that he did not tape record the defendant's confession and that this decision was in accordance with TBI policy. Agent Elrod testified that he had done all of the writing that appeared on the diagram that had been

-13-

made of the defendant's hand, which indicated that the defendant had inserted his index finger into the victim's vagina up to the knuckle. The witness testified that the only writing on that diagram that was done by the defendant was the defendant's signature. On redirect examination, the witness clarified that TBI's policy of not recording interviews was also followed by the FBI and many other city police departments and sheriffs' departments.

The State's next witness was Investigator Ricky Seals with the Bledsoe County Sheriff's Department. Investigator Seals testified that, on the night of the incident, he went to the hospital and picked up a rape kit that was given to him by Ms. Mary Spada. He testified that he took that rape kit, stored it into evidence, and later hand-delivered it to the TBI crime lab in Knoxville, Tennessee. Investigator Seals also gave direct testimony at the defendant's trial concerning his initial interview with the defendant and the defendant's subsequent confession following his interview with Agent Elrod. This testimony was similar in nature to the testimony that he gave at the defendant's preliminary hearing, which was summarized above.

Investigator Seals also read into the record his notes from his initial interview with the defendant. According to these notes, the defendant claimed that on the night in question, the victim had soiled her diaper and that, after he replaced the victim's diaper, he noticed some blood specks. The defendant claimed that he had told the victim's mother that the victim was bleeding from a diaper rash. According to Investigator Seals' notes, the defendant claimed that the victim's mother had asked the defendant what he had done to the victim after inspecting the victim's wound. Afterward, the defendant and the victim's mother talked and decided to take the victim to the hospital. The defendant claimed that he told the victim's mother that he would do a DNA test to prove that he did not do anything to the victim. Concerning the victim's subsequent confession on April 20, 2005, Investigator Seals testified that he was extremely polite during his interview with the defendant, made no promises to the defendant, and never threatened the defendant in any way.

On cross-examination, Investigator Seals testified that the defendant had never been difficult or uncooperative during the investigation. The witness testified that he was aware the defendant's children had been removed from the home and that the defendant was taking steps to try to have the children returned. The witness also testified that he was aware that Agent Elrod had not tape recorded his interview with the defendant and further testified that Agent Elrod never asked him to borrow any recording equipment on that day. Investigator Seals testified that the defendant never indicated in his confession that what happened to the victim had been done intentionally.

Investigator Seals acknowledged that he was aware that the children may have been out to visit the victim's biological father during the morning hours of the day of the incident.

-14-

Investigator Seals testified that he never interviewed the victim's biological father during his investigation.

The State's next witness was the victim's aunt, who testified that the victim spent the night with her on the night immediately preceding the night in question. The victim's aunt testified that the victim was with her from 8:00 p.m. that night until around 10:00 or 11:00 a.m. the following day. The victim's aunt testified that she gave the victim a bath during that time. The victim's aunt testified that she noticed no bruising or bleeding on the victim at any point during the time period that the victim was in her care. Ms. Moore further testified that the victim was never alone with any adult males during that time period. The witness testified that she did not observe the victim fighting or roughhousing with any other children during the time the victim was in her care.

The victim's aunt also testified that she and the victim's mother took the victim and some other children to see the victim's biological father and retrieve some belated birthday presents for the victim on the following day. The victim's aunt testified that the victim's biological father and his wife were the only ones present at the home of the victim's biological father during their visit. The victim's aunt testified that no other adults were present during this period of time and that the victim was never alone with any other person while at her biological father's house. The victim's aunt testified that they returned from this trip around 1:30 p.m. and that she went home afterward. She testified that the victim had no visible bruises or bleeding at any point prior to her and her mother being dropped off.

The victim's aunt testified that she lived for a period of time with the defendant and the victim's mother. The victim's aunt testified that, during this period of time, she observed that the victim's mother was the one who primarily took care of the victim. The victim's aunt testified that the victim's mother changed the victim's diapers and gave the victim baths.

On cross-examination, the victim's aunt testified that she was aware that the defendant and the victim's mother were working together to try and get their children returned from Child Protective Services following the night of the incident. In addition, she testified that she was aware that the victim's mother and the defendant had lived together as man and wife for approximately two weeks following the defendant's confession. The victim's aunt testified that she had never seen the defendant harm the victim and that the victim, her mother, and the defendant appeared to be a happy family.

The State's next witness was the victim's mother, who testified that she currently lived with another man and her two children. The victim's mother testified that she was previously married to the defendant. She testified that the defendant was the father of her son. She testified that the defendant was not the victim's biological father. The victim's mother

testified that at some point after she married the defendant, he adopted the victim. She testified that she had been married to the defendant for almost a year before the incident occurred.

The victim's mother testified that on the night prior to the night in question, the victim spent the night with her sister, the victim's aunt. The victim's mother testified that the victim returned the next morning and that she, her sister, the victim, and some other children went to go visit the victim's biological father to pick up some birthday presents for the victim. She testified that there were no other adult males present in the house of the victim's biological father while they were there. She testified that after this trip, they returned home at around 1:30 p.m. and that the defendant returned home from work at around 2:00 p.m. The witness testified that she left for work around 4:00 p.m. and that, as of that time, the victim had no bruises and was not bleeding. She testified that at 9:00 p.m., she received a phone call from the defendant who asked her if she had noticed any bruises on the victim. She testified that she told him no. She testified that the defendant asked her if she had left the victim alone with anyone and that she told him no. She testified that the defendant told her that the victim's ears and arm were bruised. She testified that the defendant did not leave her with the impression that any of these injuries were serious. The victim's mother testified that she returned home a few minutes later to discover the victim wrapped up in a towel and still wet from the bathtub. She testified that the defendant changed the victim's diaper and, at some point later, told her she needed to check out the victim's bottom because she had a rash and it was bleeding. The witness testified that the victim had never had a chronic problem with diaper rash. The victim's mother testified that when she checked the victim's diaper, she saw fresh blood spots on it. She testified that she asked the defendant what he had done to her baby, and she started crying. She testified that the defendant started acting "weird," like nothing was bothering him, and asked her why she was concerned. Eventually, the defendant started crying.

The victim's mother testified that she and the defendant lived in a cold house that was heated by a wood stove. She testified that this wood stove had recently gotten too hot and set their wall on fire. As a result of this incident, she testified that she and the defendant took precautions about what they placed in that stove and that they had never burned a diaper in it. She testified that she and the defendant slept on a mattress on the floor while the children slept on a sofa.

The victim's mother testified that on the night in question, the covers and blankets from their mattress were in the washing machine. The witness testified that this was unusual because the defendant had never washed those blankets before. The victim's mother testified that she asked the defendant why he was washing the blankets, and he replied that the victim had spilled food on them. She testified that she found this unusual because the victim ate in

a high chair and had never eaten on their bed. She also testified that it was unusual for the defendant to bathe the kids. The victim's mother testified that on the night of the incident, the defendant did not say anything to her about the victim having had a dirty diaper and his needing to change it. She testified that the first time she heard about a dirty diaper was when Investigator Seals came over to interview the defendant a few days later. She testified that she heard the defendant tell Investigator Seals that he had burned the victim's dirty diaper in their wood stove.

The victim's mother testified that after seeing the victim bleeding, she made the decision to take the victim to T. C. Thompson's Children's Hospital in Chattanooga. She testified that the defendant neither encouraged nor discouraged her from going. She testified that they began the trip with the defendant driving the car, but he pulled over part way through the trip and told her she would have to drive because he was getting sleepy. The victim's mother testified that she found this unusual because the defendant would normally have been awake at that time of the evening. She testified that after she took over the driving, the defendant slept in the car all the way to the hospital.

The victim's mother testified that after they arrived at the hospital, the victim was examined by a doctor and taken into surgery. She testified that she waited in the waiting room for a while and was eventually approached by Nurse Spada, who questioned her regarding the child's activities for the preceding twenty-four hours. She testified that after finishing this interview, she returned to the hospital's waiting room and saw the defendant asleep on the couch with their infant son sitting next to him in the car seat.

The victim's mother testified that she was present in the building on April 20, 2005, when the defendant spoke with Agent Elrod and Investigator Seals. The witness testified that at some point during that day, Investigator Seals took her back to his office, telling her that the defendant had just signed a confession. She testified that when she went into the room with the defendant, the defendant told her that he had hurt the victim, that he was sorry, and that he had not intended to hurt her. She testified that the defendant was crying and hugged her. She testified that she read a statement afterward that the defendant had given in which he stated that he had put his finger into the victim.

The witness testified that she continued to live with the defendant for approximately two weeks after reading his confession. She testified that during this time, the defendant gave her additional explanations regarding what might have caused the victim's injuries. She testified that the defendant claimed that the victim might have been hurt by some toys in the bathtub or that he might have wiped the victim too hard when he was cleaning her after she defecated.

-17-

On the stand, the victim's mother was shown some pictures of the victim's injuries on the night of the incident. The witness testified that the bruising that was depicted in the pictures appeared worse than what she had seen earlier in the evening. The victim's mother testified that the victim's bruising appeared to have worsened while the victim was at the hospital.

On cross-examination, the victim's mother testified that she was aware that the defendant's counsel had been attempting to speak with her for the last week and that she had sent word to the defendant's counsel that she would not do so. The victim's mother testified that when she married the defendant he treated her children very well and treated the victim as if she was his own daughter. She further testified that the defendant had been good to the victim and that she had never claimed that the defendant had ever been bad to her daughter prior to the incident.

The victim's mother testified that two days before the incident, the victim was at a birthday party where numerous adults were in attendance. The witness testified that the defendant was at guard duty on the following day and for most of the day of the incident. The victim's mother testified that on the morning of the incident, she took the victim to visit her biological father. The witness testified that she may not have personally observed the victim's bottom before she left for work that day – she did not keep track of when she changed the victim's diapers. The witness testified that when the defendant called her at work and reported that there was bruising on the victim's arm and ears, she was not particularly concerned because she thought she could hear the victim laughing in the background.

The victim's mother testified that when she returned home, the defendant had apparently just gotten the victim out of the bathtub. She testified that she never told Investigator Seals during his investigation that there was anything unusual about the defendant bathing the children. The witness testified that when she first took off the victim's diaper on the night of the incident, there appeared to be three or four spots of blood on it that were smaller than a penny. She testified that the defendant never tried to deter her from taking the victim to a doctor and that the defendant never tried to stay at home, leave, or go somewhere else once she decided that the victim needed to go to the hospital. The victim's mother testified that on the way to the hospital, the victim did not appear to be in obvious distress, but was simply very quiet.

The victim's mother testified that after the children were removed from their home, she and the defendant worked with the Department of Children's Services in an attempt to have the children returned. She testified that the defendant took parenting classes, had a psychological evaluation, and took other steps required by DCS. The victim's mother

testified that it was made clear to her and the defendant that if they did not do everything necessary to cooperate with law enforcement, the Department of Children's Services would probably not return their children.

The victim's mother testified that as of June 21, 2005, the Department of Children's Services still had not returned her children. She testified that she was told that she needed to acknowledge the defendant's responsibility. She testified that after hearing this, she told the defendant that she was divorcing him so that she could get her children back. She testified that not long after she filed for divorce, DCS returned her children.

On redirect examination, the victim's mother testified that prior to going to the sheriff's office on April 20, 2005, the defendant never told her that he was going to confess so she could get her children back. She also testified that after the defendant made his statement to police, he never told her that he had confessed so that she could get her children back.

On recross-examination, the victim's mother testified that she no longer loved the defendant. Defense counsel then asked her whether there was a "new man in your life." The State objected, and the trial court sustained the State's objection. Defense counsel urged that the question was relevant in order to establish the witness' bias. The trial court instructed the jury to disregard the question. Defense counsel asked no further questions and the witness was excused.

Following this testimony, the State read into the record portions of a previously-taken deposition of Dr. Thomas Bruns. In this deposition, Dr. Bruns stated that he was an emergency pediatrician with fifteen years of experience, and that on January 11, 2005, he treated the victim for vaginal bleeding and bruising to various areas of her body. Dr. Bruns stated that the victim appeared calm when he first saw her and that both of her parents seemed concerned. Dr. Bruns added that the defendant "seemed a little bit nervous in general." Dr. Bruns described the injuries he observed during his physical examination of the victim, including significant bruising to both ears as well as "petechial rash" around the victim's neck and under her chin area. Dr. Bruns explained that a "petechial rash" was small points of bleeding underneath the skin caused by trauma, which appear to be pinpoint areas of blood (as opposed to larger bruising). Dr. Bruns explained that the difference between bruising and petechial rash in terms of causation usually had to do with the amount of force applied to the skin. Dr. Bruns testified that the petechial rash he saw on the victim's neck could be consistent with the application of a cord, rope, or hands and fingers. Dr. Bruns testified that significant pressure would have to be applied in order to disrupt the blood vessels underneath the skin in this fashion. Dr. Bruns testified that, in his expert opinion, the injuries he observed on the victim would have occurred within the previous six to twelve

hours. Dr. Bruns testified that the amount of time it would have taken for the victim's bruising to appear following her injury would have been between ten and forty minutes and perhaps even sooner.

Dr. Bruns stated that when he looked at the victim's diaper area, there was a significant amount of blood present in the perineal area. Dr. Bruns testified that when he washed this blood off in order to do an exam, the victim's anus showed no abnormalities or bruising. Dr. Bruns testified that when he examined the victim's vagina, he could observe no visible hymen and that the victim's anatomy had been disrupted to the point that he could not "make out any anatomy." Dr. Bruns stated that the victim's vaginal opening essentially "looked like hamburger meat." Dr. Bruns stated that the victim's vaginal area "was very bloody, macerated" and "cut and bumpy." Dr. Bruns stated that he determined from his examination that the victim had suffered some form of trauma to her vaginal area and decided to call in Dr. Lisa Smith to perform a more thorough examination of the victim under anesthesia.

Dr. Bruns stated in his deposition that the victim's diaper contained a significant amount of blood. Dr. Bruns further stated that significant blood had come down and covered the area of the victim's buttocks and that a large blood clot that had formed on the victim's vaginal area. Dr. Bruns stated that while he was performing his exam, the victim kept dripping blood that would trickle down her buttocks onto the diaper. Dr. Bruns testified that, in his expert opinion, the victim's vaginal injuries had occurred within the previous six to eight hours. Dr. Bruns testified that he based his opinion on the fact that the clot he discovered was freshly-formed and the fact that the victim's wounds were still bleeding profusely. Dr. Bruns explained that blood clots appear different when they have been present for more than eight to twelve hours, and that the longer a blood clot has been present, the more gelatinous it becomes.

Dr. Bruns testified that the victim would have bled significantly when she was first injured. Dr. Bruns testified that the tearing and destruction of the victim's vagina would have been very painful and that he would have expected any child sustaining such an injury to cry. Dr. Bruns testified that anyone performing a routine diaper change of the victim would have noticed the injury. Dr. Bruns testified that after approximately twenty minutes, the victim's blood would have clotted and the blood flow would have slowed, but there would continue to be drips of blood for some time. Dr. Bruns testified that any person who was in the presence of the victim when this injury occurred would have noticed that something was wrong. Dr. Bruns testified that, in his professional opinion, the injuries to the victim were not accidental and the victim had been sexually assaulted. Dr. Bruns testified that he had seen many diaper rashes in his time and that the victim did not have a diaper rash when he examined her. Dr. Bruns testified that his examination revealed no sign of a recent

diaper rash on the victim and, furthermore, it is very rare for a child experiencing a diaper rash to bleed.

Dr. Bruns stated in his deposition on cross-examination that it would have been possible for the bruising around the victim's ears to have occurred as much as five days in the past and that it was possible that the victim's hair could hang down over her ears in a manner that an individual around her would not necessarily notice the bruising. Dr. Bruns also stated in his deposition that a bath could dissolve a blood clot, that a new blood clot could form in its place, and that this pattern could be repeated several times. Dr. Bruns stated in his deposition that the victim did not appear to be in pain following her examination.

Next, the State read into the record portions of the deposition of Dr. Lisa Smith. In her deposition, Dr. Smith stated that she was a pediatric surgeon with four years of experience and that she treated the victim on the morning of January 11, 2005. Dr. Smith stated that she was asked to examine the victim by the attending emergency room physician and, when she did so, she observed bruising around the victim's head, face, and neck. Dr. Smith stated that she observed "petechial bruising" (which she explained is the early presentation of what would later become a bruise) around the victim's neck in a circular fashion as well as on both the victims ears. Dr. Smith stated that "petechial bruising" consists of small little red dots of broken capillaries. Dr. Smith stated that in her expert opinion, this bruising would have been inflicted within twelve hours of her evaluation.

Dr. Smith stated that she took several photos of the victim while performing her examination that showed the injuries to the victim's ears, neck, and vaginal area. Dr. Smith identified those pictures of her deposition. Dr. Smith stated that following her examination, she concluded that there was no injury to the victim's anus or cervix. Dr. Smith stated that the entrance to the victim's vagina was lacerated in a linear fashion at the six o'clock position and that she performed a repair to that laceration. Dr. Smith stated that this repair consisted of two sutures as well as applied pressure.

Dr. Smith stated that her postoperative diagnosis was that the victim's injuries had been caused by sexual abuse. Dr. Smith stated in her deposition that she reached this conclusion by determining that the victim's injuries were inconsistent with falling, being struck by a vehicle, or any other form of genital trauma that was not related to abuse. Dr. Smith testified that, in her experience, the only mechanism that could cause the sort of injury she observed on the victim is the attempted insertion of an object into the vagina. Dr. Smith explained that injuries caused by the insertion of an object into a vagina will usually occur at the six o'clock position. Dr. Smith stated that she could not identify what object caused the injury from performing a physical examination.

Dr. Smith testified that, based on her conclusion, she contacted the Children's Advocacy Center and that Nurse Spada responded and administered a rape kit on the victim. Dr. Smith testified that based on her examination, the victim's vaginal injuries had occurred in the previous twelve to twenty-four hours. Dr. Smith testified that she reached this conclusion based on the fact that a fresh blood clot was present and no actual healing of the laceration had taken place. Dr. Smith stated in her deposition that the victim's injuries would have been painful. Dr. Smith stated that some children would respond to these types of injuries by crying; others would withdraw completely and be very quiet. Dr. Smith stated that the victim's injuries would have been noticeable to anyone changing the victim's diaper. Dr. Smith stated that it would probably have taken twenty-four hours before the wound would have clotted up to the extent that there would have been no additional bleeding.

After these portions of Dr. Smith's deposition were read into the record, the State rested. The defendant made a Motion for Judgment of Acquittal on the grounds that the State had failed to show that any penetration that might have occurred of the victim's vagina was sexual in nature. The trial court denied the defendant's motion.

The first witness for the defense was Mr. William Watson, the laboratory director at Orchid Cellmark, the largest private DNA testing laboratory in the United States. Mr. Watson testified that he had extensive experience related to serology and DNA testing. Mr. Watson testified that he ran tests for semen on several items that were given to him and that none of those tests had positive results. Mr. Watson testified that he did not personally observe any of the slides that had been discussed in the report prepared by the Tennessee Bureau of Investigation; however, he had reviewed the report made by the technician who had reviewed the slides. In particular, he had reviewed that report's conclusions with respect to a single slide that the TBI determined revealed the presence of six spermatozoa which did not have tails.

Mr. Watson testified that it was his opinion that for a slide of that nature, six spermatozoa would be considered a very low number. Mr. Watson testified that on average, male ejaculation contains 40 to 100 million spermatozoa per milliliter. Mr. Watson testified that given the timing of the collection of the swab, this number did not appear to be correct to him. If the swab had been collected within twelve to sixteen hours of the alleged assault, he would have expected the sample to test positive for semen and to detect a much larger number of spermatozoa.

Mr. Watson further testified that if spermatozoa are collected mere hours after being deposited, he would expect for any spermatozoa found to be discovered intact. Mr. Watson testified that tails on spermatozoa tend to degrade after sixteen to twenty-four hours. Mr. Watson testified that, in his experience, there are many things that can be mistaken for the

head of a spermatozoa. Mr. Watson testified that yeast cells, in particular, look very much like the heads of spermatozoa and stain the same color in laboratory tests.

Mr. Watson testified that it would have been helpful to him in his analysis if he had been able to view the actual slides, or at least pictures of them, in order to properly determine whether or not spermatozoa were present. Mr. Watson testified that it also would have been possible to test the victim's diapers and the washcloth used by the treating physician to wipe away the blood from the victim's vaginal area. Mr. Watson testified that according to the materials he had received from the TBI crime lab, no such testing had ever been done.

Mr. Watson testified that it was not uncommon in his experience for the victims of sexual assault to bathe or be bathed prior to the collection of samples. Mr. Watson testified that, in his experience, it was relatively common to still discover DNA evidence in those situations. Mr. Watson testified that in other cases he had dealt with he was able to get a complete or partial DNA profile based on the sample he received. Based on the materials he reviewed, Mr. Watson testified that the TBI was not able to generate a DNA profile in this case based on the sample it had received.

On cross-examination, Mr. Watson testified that he had not actually talked to any of the DNA analysts and that his professional opinions were prepared simply from looking at notes. Mr. Watson testified that he never contacted any of the technicians involved to determine whether or not the samples at issue had been destroyed or whether it would still be possible to review them. Mr. Watson testified that in his review of the examinations performed by the TBI and the private laboratory they retained, he had concluded that both labs had followed proper protocols with respect to the testing that they had performed. Mr. Watson also testified that if spermatozoa are deposited on an object and that object is later washed, the washing could reduce or eliminate the spermatozoa found on the object.

Next, the defense presented the testimony of Ms. Misty D'Amico of the Department of Children's Services. Ms. D'Amico testified that she was the foster care worker who worked with the defendant in January of 2005. Ms. D'Amico testified that she developed a "permanency plan" for the parents of the victim in this case. Ms. D'Amico testified that a "permanency plan" is a plan developed by the Department of Children's Services for every child that enters their custody explaining how DCS will work with the parents to get the child back into the parents' custody. From the stand, Ms. D'Amico read from section eight of her permanency plan, which listed the family's strengths. In this section, she wrote that the defendant and his wife like to "share family time," "show lots of love and affection to their children," and were "determined, good parents." Ms. D'Amico testified that the permanency plan required the defendant to take parenting classes and undergo a psychological assessment, and that the defendant completed these requirements. Ms. D'Amico testified that

while the children were removed from the home, the parents were allowed supervised visitation visits. She testified that she was present for some of the supervised visitation visits and that the victim did not appear to be distressed by being around the defendant.

Ms. D'Amico testified that the permanency plan required the defendant to "acknowledge the circumstances that caused [the victim's] injuries and acknowledge the severity of the sustained trauma." In addition, the permanency plan stated that the defendant and his wife "need to cooperate with law enforcement and DCS during this investigation so that the perpetrator can be identified." Ms. D'Amico testified that both those requirements would have to be satisfied before the children would be returned to the parents. Ms. D'Amico testified that the permanency plan specified that if the parents failed to comply with the plan, then custody would not be returned to the parents and the victim would permanently live with other relatives. Ms. D'Amico testified that as of April of 2005, the defendant and his wife had done everything that was listed on the permanency plan with the exception of the requirement pertaining to the defendant's acceptance of responsibility, yet the children still not had been returned to them.

Ms. D'Amico testified that following the defendant's confession, DCS recommended that the children remain in custody until the allegations against the defendant had been resolved. DCS recommended that the children not be returned to the mother because the mother did not acknowledge the defendant's confession. Ms. D'Amico testified that the children were returned to the defendant's wife in October of 2007.

On cross-examination, Ms. D'Amico testified that the defendant's wife was in denial for a period of time after the defendant "shocked" her with his confession. Ms. D'Amico stated that the portion of the permanency plan requiring both parents to cooperate with law enforcement did not require either of them to give a confession before the children could be returned to them. Ms. D'Amico testified that this provision simply required the parents to speak with law enforcement officials if law enforcement officials wanted to talk to them. Ms. D'Amico testified that the defendant's wife had never confessed to doing anything to the victim yet she had possession of the children today.

The next witness for the defense was the defendant himself. The defendant testified that he was currently twenty-four years old. He testified that he had married the victim's mother in February of 2004, adopted the victim, and had a second child with the victim's mother. He testified that when the victim's mother worked the night shift, he would take care of the victim during the evenings. He testified that when he was taking care of the victim, he would change her diaper, feed her, and occasionally give her baths. He testified that he also cooked and did laundry on occasion.

The defendant testified that some time after February 2004, there was a problem with the victim's biological father that involved a bruise. The defendant testified that this problem led to litigation that was settled out of court. The defendant also testified that the victim often suffered from diaper rash and that he had recently taken her to a doctor at a nearby clinic to be treated for diaper rash, although he could not remember the doctor's name.

The defendant testified that on the weekend immediately before the incident, he had National Guard duty. He testified that on Sunday night after he completed his Guard duty, he took his son to the hospital and did not return until the early morning hours of Monday morning. He testified that he woke up at 4:00 a.m. that same day and went to his job. He testified that he returned home around 2:00 p.m. that day, and had not seen the victim prior to that time because she had spent the previous evening at her aunt's house. The defendant testified that between 2:00 p.m. and 4:00 p.m. on that Monday, he and his wife did household chores. He testified that he did not remember washing any sheets that day but that he had never heard, prior to his wife's testimony in this case, anything about bedclothes being washed.

The defendant testified that he made Hamburger Helper for the victim's dinner that evening and fed formula to his son. He testified that the victim was not fed from a high chair but would eat "wherever she flopped down at, you couldn't strap her in a high chair if you tried." The defendant testified that he could not remember whether the victim had spilled anything on the bed that evening.

The defendant testified that he and his wife were potty training the victim and that she had just gotten to the point where she would tell them when she had soiled her diaper. He testified that on the night in question, the victim came in and told him that she had soiled her diaper. He testified that he went to change her diaper, and discovered that she was covered in feces from the front of her stomach to her back. The defendant testified that his wife had not changed the victim during the time period while he had been at home and stated that it was clear that the victim had not been changed in a long time. The defendant testified that he cleaned the victim as best he could and then put her in the bath to finish cleaning her up. The defendant testified that after he removed the victim from the bathtub, he noticed that the victim was bleeding. He testified that he did not notice the bleeding sooner because the victim was covered in feces.

The defendant testified that shortly before changing the victim's diaper, the victim sat down in front of him and he noticed that she had bruises on her ear and on her arm. He testified that he called his wife at work and reported the injuries. He testified that his wife did not seem worried. The defendant testified that when his wife got home, he asked her to look at the victim's injuries. He testified that when she did so, his wife started crying, which

-25-

made him feel "like crap." He testified that he did not cause the bruises to his daughter.

The defendant testified that he would always dispose of dirty diapers in the garbage can, that he never burned diapers in the wood stove, and that he never told anyone that he had burned a diaper in a wood stove. He further testified that it was not at all unusual for him to give a bath to the children and that he and his wife took turns doing it. He also testified that it was normal for them to switch off as drivers when they were traveling somewhere together. The defendant testified that he became drowsy on the drive to the hospital because he had only had three hours of sleep the night before. He testified that he pulled over and swapped driving duty with his wife because he was worried about falling asleep at the wheel, and that there was generally nothing unusual about him having his wife drive. He testified that the victim fell asleep during the drive and did not appear to be in any distress.

The defendant testified that the Department of Children's Services got an emergency injunction to take the children away before he and his wife even left the hospital. He testified that he and his wife immediately started taking steps to try to get the children back, including contacting an attorney, Mr. Keith Grant. The defendant testified that he initially spoke with Investigator Seals prior to retaining an attorney. He testified that he was contacted by Investigator Seals on April 19, 2005, and asked to speak with Agent Elrod at the Sheriff's Office the next day. He testified that he consented to doing so.

Concerning the events of April 20, 2005, the defendant gave testimony that was essentially the same as the testimony he gave in his motion to suppress concerning the statements that he made Agent Elrod and Investigator Seals, except no reference was made to the polygraph examination. Generally, the defendant claimed that Agent Elrod had promised him that he would not have to serve any jail time and that his children would be returned if he confessed. The defendant claimed that he was motivated to confess because he was fixated on concerns about the way his children were being treated in foster care – and specifically, because during one visitation he noticed that his son had a black eye and was being spanked even though he was only seven months old and that his daughter had chicken mites in her eyes and was not receiving medical treatment. Once he decided to take the deal, the defendant claimed that Agent Elrod created a tracing of his hand, fabricated the remaining portions of the diagram, and fed him a story to tell to Investigator Seals. The defendant claimed that he told Agent Elrod's story to Investigator Seals even though he knew it was a lie.

The defendant claimed that he did not rape the victim, insert his penis into the victim, or ejaculate into the victim. The defendant claimed that he loved his children and was responsible for their child support. The defendant claimed that he did not hurt his daughter and that he had not injured her in any intentional or sexual way.

On cross-examination, the defendant further discussed the incident involving the victim's biological father. The defendant stated that about a year before the night in question, the victim had shown up with a bruise on her leg and that following this incident, he and his wife had made a deal with the victim's biological father in which he would no longer have to pay child support if he would give up his visitation rights.

Concerning the night in question, the defendant clarified that he did not notice any bruising on the victim until three and a half to four hours after his wife left for work. He vehemently confirmed his denials of his wife's accusations that he never gave the children baths, never washed the sheets, and had ever said that he had burned a diaper in the stove. He testified that he did not tend to get sleepy after ejaculation.

Concerning the events surrounding his confession, the defendant claimed for the first time at trial that, after making his confession, he informed his wife that he had confessed just so she could get her children back. When asked why he would make such confession when, after all of the proceedings he had participated in before a juvenile judge he must have been aware that Agent Elrod could not promise him that his children would be returned, the defendant said that he believed the promise because the DCS was telling him the same thing. When asked how, after hearing the depositions taken from the two doctors concerning the extent of the victim's injuries, he could have ever thought that DCS would someday return custody of the victim to him, the defendant could not explain his reasoning. The defendant also asserted that he was crying genuine tears following his confession, even though he knew the confession was fake. The defendant denied that he told his wife other stories about what happened to the victim following his confession.

On redirect examination, the defendant testified that following his statement to police, he and his wife were hugging and crying and Investigator Seals had to break the two of them up. The defendant testified that he cried in front of his wife at the jail because he felt like what happened to the victim was his fault. He claimed he was crying because "I'm her father, and I didn't do anything to my child, but she got hurt, and I couldn't fix that." On recross-examination, the defendant claimed to be crying following his confession because he was trying to take the blame for somebody else, to fix a wrong that someone else had done that he could not fix.

The next witness for the defense was Sergeant Jason Witt, a commander of a Bradley fighting vehicle in the National Guard who had worked with the defendant for approximately eight years. Sergeant Witt testified that he and his then-wife spent considerable time with the defendant and the victim's mother when they were together and that, on most of these occasions, the couple would have both of their children with them. The witness testified that he had plenty of opportunity to see how the defendant interacted with the children on these

occasions. He testified that the defendant loved being around his children and took care of them. He testified that the defendant would play with the children, feed them, and clean them.

Sergeant Witt testified that he was the defendant's supervisor in the National Guard, and that the defendant had a reputation in the military community for his honesty. Sergeant Witt also testified that he personally believed that the defendant was very believable and honest. He testified that even though he was aware that the defendant had made incriminating statements, he still believed the defendant.

On cross-examination, Sergeant Witt testified that he was a good friend of the defendant and did not want to see the defendant get in trouble. He also testified that although he was appearing in court in his military uniform, he did not have any type of order permitting him to do so. When asked if the defendant, as a truthful person, should be believed when he told police officers that he stuck his finger in the victim's vagina, the witness testified that he did not know if the defendant had lied to those officers or not. He testified that no matter how many times he was told that the defendant had told lies, it would still be his opinion that the defendant was a truthful person.

The final witness for the defense was Ms. Doris Thurman, the defendant's aunt. She testified that she was around the defendant and his family on several occasions while they were married and had the opportunity to observe the defendant around his children. She testified that he cared for his children and would engage in activities like feeding them and changing their diapers. She testified that when the family was in her presence, he, rather than his wife, seemed to pay more attention to the kids.

On cross-examination, Ms. Thurman testified that she had never seen the defendant give the children their baths. She testified that he changed their diapers more frequently than did his wife. She also testified that he would never wait six or seven hours without checking a child's diaper and would not let a child get covered in feces from stomach to back; he would certainly check the child's diaper before something like that occurred.

Following this testimony, the defense rested, and the trial court instructed the jury. The parties then proceeded to give closing arguments, with each side delving into the testimony of the witnesses and highlighting the points in favor of their position. However, during rebuttal argument, the prosecutor commenced by saying, "I want to thank my good friend, Mr. Jeff Harmon for doing an excellent job in this case because he does what he gets paid to do and that's to represent his client as best he can to get him off, that's his job and he does a. . . ." At this point, the prosecutor was cut off by an objection from the defense to the prosecution's assertion that it was the defendant's counsel's job to get someone off rather

than get them a fair trial. This objection was overruled. Closing argument continued, and the jury retired to deliberate.

On May 22, 2008, the jury returned with a verdict of guilty as charged. The defendant was sentenced on August 25, 2008, to eighteen and a half years. The defendant filed a timely motion for new trial, which was denied by the trial court on January 8, 2010. The defendant filed a timely notice of appeal. Our decision follows.

## ANALYSIS

The defendant claims that the trial court erred by failing to suppress his pretrial statements to police and by not allowing the defendant to question his ex-wife on the stand concerning whether there was a "new man" in her life. However, we can discern no error in these rulings. The defendant claims that the evidence was insufficient to support his conviction, but we hold that a reasonable jury could have found the defendant guilty of the rape of a child based on the evidence presented at trial. Finally, the defendant claims that the prosecutor engaged in misconduct by asserting in his closing argument that the defendant's counsel was "paid to get his client off." We agree that the prosecutor's comment was inappropriate. However, we do not believe that the defendant has shown that this singular comment affected the outcome of the case in light of the overwhelming evidence against the defendant. Consequently, we affirm the judgment of the trial court. Our specific reason for rejecting each of the defendant's claims is as follows:

## I.

The defendant claims that the evidence is insufficient to support his conviction for rape of a child. In order to resolve this claim, we must apply the traditional principles of appellate review to claims concerning the sufficiency of the evidence. Concerning such challenges, the ultimate question "is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof," and its decisions concerning these matters will not be reversed on appeal. *Id.* A jury's verdict finding the defendant guilty of a crime strips the defendant of his presumption of innocence and raises a presumption of guilt; consequently, "the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). After reviewing the record in this case, we conclude that the defendant has failed to carry this burden.

A jury found the defendant guilty of one count of rape of a child in violation of Tennessee Code Annotated section 39-13-522, which states: "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is . . . less than thirteen (13) years of age." There is considerable testimony and evidence in the record concerning the victim's age – which was attested to be well below thirteen years – and this matter is not disputed on appeal. Rather, the defendant challenges the jury's finding with respect to whether he committed sexual penetration. "Sexual penetration" is defined by statute as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . emission of semen is not required." T.C.A. 39-13-501(7) (2004).

The defendant's written confession to police fully supports a jury's conclusion that the defendant committed sexual penetration in this case. In his written confession, the defendant stated that his index finger, which is unquestionably a part of his body, penetrated the victim's vagina. Neither the degree of this intrusion (whether to the end of the defendant's fingernail or to the end of his knuckle) or its duration (whether a full "four or five seconds" or "only a second") matters for purposes of establishing the existence of the element of sexual penetration; the terms of the statute specify that penetration is deemed to occur by "any intrusion, however slight." A reasonable jury was free to rely upon the defendant's confession in order to find this statutory element satisfied and the defendant guilty of the crime charged.

Although the defendant claimed that this confession was false – instigated and crafted by Agent Elrod, and secured by virtue of his false promises – the jury also heard contrary testimony from Investigator Seals and Agent Elrod. It was the province of the jury as the finder of fact to assess the credibility of these witnesses and resolve the conflicts between their testimony. We will not disturb their decision in this regard on appeal.

We observe, however, that the defendant challenges the trial court's decision to decline to suppress the defendant's confession as a violation of his constitutional rights. Were a reviewing court to find merit to such a claim, this thread of evidence, which standing alone suffices to support the jury's conclusion concerning sexual penetration, would have been absent from the comprehensive tapestry viewed by the jury in ascertaining the defendant's guilt. Nonetheless, the other remaining evidence would suffice to support the jury's conclusion.

Devoid of confession, with an aphasic toddler as a victim and an utter dearth of eyewitnesses, the occurrence of sexual penetration of the victim by the defendant could not be established by direct evidence. However, "[a] criminal offense may, of course, be

established exclusively by circumstantial evidence." *Sisk*, 343 S.W.3d at 65. Our method and standards of review are "the same whether the conviction is based upon direct or circumstantial evidence." *Id.* (internal quotations omitted).

In this case, three expert witnesses – Nurse Spada, Dr. Bruns, and Dr. Smith – testified that the victim was brought into the hospital on the night in question with severe trauma to her vaginal area. Two of these witnesses testified that, in their expert opinion these injuries were the result of intentional sexual abuse, and could not have occurred by accident. Both Nurse Spada and Dr. Smith specifically testified that this kind of injury could only have resulted from the penetration of the victim's vagina by an object. There was no contrary testimony concerning the nature of the victim's injuries. From this testimony, a reasonable jury could conclude that the victim's genitalia had been intruded upon by "any part of a person's body or . . . any object," as required to establish sexual penetration as defined by section 501(7).

The only remaining conclusion made by the jury that must find support in the evidence is that this penetration was committed by the defendant. In this regard, three expert witnesses testified that the victim's injuries had occurred within the preceding twenty-four hours. Expert witnesses also testified that the bruises on the victim's body would have been evident to those around the victim within less than an hour of her injury and that the blood coming from the victim's vagina would have been evident to anyone changing the victim's diaper. The victim's mother and the victim's aunt testified concerning the victim's whereabouts in the twenty-four hours immediately preceding her injury. Both witnesses testified that the victim was never alone with another adult and that the victim had no visible injuries when they left her. Although the defendant testified directly that he did not sexually penetrate the victim, the jury was free to discredit this testimony and credit the testimony that establishes, through circumstantial evidence, that the defendant was the only individual who was alone with the victim during the period of time in which her injuries must have occurred and was the only one who had the opportunity to sexually penetrate her.

The defendant urges that the State's evidence is deficient because the tests performed by the TBI did not reveal evidence of semen in swabs taken from the victim and revealed only six spermatozoa (an unusually low number) in a single slide taken from the victim's vaginal swab. Moreover, ordinary yeast cells could appear very similar to these spermatozoa, given the manner in which they had degraded. However, no evidence concerning semen or spermatozoa is necessary to support the defendant's conviction of rape of a child. The relevant statute specifically states that rape occurs when the victim is penetrated by "any object," not just a penis, and that "emission of semen is not required." T.C.A. 39-13-501(7). Consequently, arguments of this nature are to no avail for the defendant. Likewise, the defendant urges that his conviction cannot stand because Nurse Spada testified that the

visible portion of the victim's hymen appeared to be intact. However, the statute does not require that a victim's hymen be broken before sexual penetration will be deemed to have occurred. It requires only "any . . . intrusion, however slight" into the victim's genital opening. Moreover, Nurse Spada testified that she did not get a complete view of the victim's hymen due to an obstructing blood clot, and that even if the victim's hymen was completely intact this fact would not preclude the possibility that she had been sexually assaulted.

The defendant also argues that the State failed to prove that any penetration of the victim by the defendant was intentional. However, Section 522(a) does not specify the mental state required in order to commit rape of a child, and where a statutory definition neither provides for nor dispenses with the culpable mental state necessary to commit a violation, it is well established that "intent, knowledge, or recklessness suffices to establish the culpable mental state." T.C.A. 39-11-301(c). Regardless, two expert witnesses testified in this case that the victim's injuries could not have occurred by accident, and from this testimony a reasonable jury could have concluded beyond a reasonable doubt that the penetration that occurred was intentional. The defendant further urges that the State failed to establish that any penetration of the victim by the defendant was "of a sexual nature." However, although the crime of rape of a child prohibits "unlawful sexual penetration of a victim," the term "sexual penetration" has been defined by statute as encompassing "any . . . intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim. . . ." T.C.A. §39-13-522(a). Conspicuously absent from this definition is any requirement that the penetration at issue be done for purposes of sexual gratification. Consequently, the State need only establish that the requisite penetration occurred, and that it was done by the defendant in an intentional, knowing, or reckless manner. The State does not have to establish that the defendant intended for the penetration to be sexual in nature or that the defendant committed the act for purposes of sexual gratification.

Taken as a whole, there is evidence to support a reasonable jury's conclusion that every element of the statute was satisfied by the defendant's conduct. The defendant is entitled to no relief on this issue, and the judgment of the trial court is accordingly affirmed.

## II.

The defendant's second claim is that the trial court erred in failing to suppress his confession on the grounds that it was obtained in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 9 of the Constitution of Tennessee because (1) he was questioned by police after he asserted his right to counsel and (2) his confession was involuntary, having been compelled by false promises made to him

by Agent Elrod. On appeal, a "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Davis*, 2011 Tenn. LEXIS 962, at *14 (Tenn. Oct. 17, 2011) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "When the trial court has seen and heard the witnesses testify, we must afford considerable deference to the factual determinations made by the trial court." *Id.* Moreover, "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* (*quoting Odom*, 928 S.W.2d at 23)). A trial court's application of law to the facts is reviewed *de novo* without a presumption of correctness. *Id.*

It is well established that as a general rule both the Fifth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution require the police to cease questioning after a suspect invokes his right to counsel until the defendant's counsel is present. *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 474 (1966); *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). Moreover, both the Fifth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution require that any confession made by a defendant be voluntary rather than compelled by the police. *See, e.g., Bram v. United States*, 168 U.S. 532, 542-43 (1897); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). "The test of voluntariness for confessions under Article I, [section] 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *Smith*, 933 S.W.2d at 455. "Promises of leniency by state officers do not render subsequent confessions involuntary per se," rather, the "critical question is whether the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about [a] confession[] not freely self-determined." *Id.* (internal quotations omitted).

In this case, the trial court was confronted with starkly conflicting testimony from the three witnesses who testified concerning the suppression issues. The defendant testified that he plainly asserted his right to counsel and that Agent Elrod promised that he would not go to jail and would be reunited with his children if he confessed. He testified that Agent Elrod fabricated a story for him to tell to Investigator Seals and that he told that story, knowing it to be a lie, because he was overwhelmed with a desire to have his children returned and to get them away from wife's parents, who were neglecting and abusing them.

Conversely, Agent Elrod testified that defendant executed a written *Miranda* waiver expressly waiving his right to counsel prior to making his statement. In addition, Agent Elrod testified that the defendant never asserted his right to counsel and never made so much as an ambiguous reference to an attorney. Agent Elrod testified that had the defendant requested a lawyer, he would have ceased all questioning. Agent Elrod denied making any promises to the defendant concerning his treatment or the possibility of seeing his children

if he confessed. Investigator Seals also testified that the defendant executed a written *Miranda* waiver prior to speaking to him. He further testified that he never heard the defendant assert his right to counsel and that the defendant never indicated to him that his confession was the result of any understanding between himself and Agent Elrod concerning his treatment or the return of his children.

The trial court assessed the credibility and demeanor of these conflicting witnesses and found as factual matters that: (1) the defendant never asserted his right to counsel; (2) Agent Elrod did not help the defendant fabricate his confession; and (3) the defendant's confession was not coerced by any promises made by Agent Elrod. These were quintessential factual determinations, and we afford them great deference on appeal. The defendant urges that the trial court's findings are unsupported by the facts; that "the defendant's position [that he was innocent] did not magically change when he went to the jail to be polygraphed." However, the defendant's act of failing the polygraph (whether by one question, as he claimed in his testimony, or by three, as attested to by Agent Elrod) provides strong motive for his subsequent confession. Moreover, as the trial court observed, by this stage of the investigation, the defendant was well aware of the severity of the victim's injuries. It simply strains credulity to conclude that the defendant could have possibly believed that giving a confession at this point would allow him to regain custody of his daughter or avoid serving any jail time. Consequently, we will not overturn the trial court's factual findings pertaining to the suppression issue.

Absent any assertion by the defendant of his right to counsel or any promises made by Agent Elrod, there is simply no factual basis on which this court might predicate a holding of constitutional error. Accordingly, the defendant is entitled to no relief on this issue.

### III.

The defendant claims that the trial court erred by refusing to allow him to question his ex-wife regarding the "new man" in her life. "Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court's exercise of discretion will not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (*quoting State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). The defendant has failed to established that the trial court abused its discretion by refusing to allow him to question her regarding her "new man."

As a general rule, all relevant evidence is admissible unless a particular constitutional provision, statute, or rule excludes it. Tenn. R. Evid. 402. However, relevant evidence may

be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The defendant had failed to establish that the trial court acted illogically or misapplied these rules when it sustained the State's objection to his question.

While the defendant is generally correct in his assertion that a party may offer evidence that a witness is "biased in favor of or prejudiced against the party or another witness," the defendant has failed to show how questions regarding his ex-wife's current love life would be relevant to the issue of her bias. The witness could quite easily be currently seeing other people and still be biased in favor of defendant, or be alone and still be biased against him. The defendant has not shown that the witness had any motive to alter her testimony based solely on her then-present relationship status. Consequently, the trial court did not defy all logic and reasoning by determining that, on the facts of this case, this question delved into a subject that had no discernable tendency to "make the existence of any [bias] more probable or less probable than it would be without the evidence," as required to establish relevance under Tennessee Rule of Evidence 401.

More importantly, the defendant's counsel had just asked his ex-wife whether she still loved the defendant, and she admitted that she did not. Consequently, any further questioning that was intended solely to establish that the witness no longer loved the defendant, and was therefore biased against him, could fairly be considered needlessly cumulative under Rule 403. Moreover, allowing the defendant to parade details of his ex-wife's current love life in front of the jury posed a realistic danger of confusing the jury and distracting them from the relevant issues. Rule 403 expressly permits trial courts to preclude questioning on these grounds. Lastly, to the extent the defendant sought to establish through this question that his ex-wife was biased against him, a host of other, more direct questions were available to accomplish this task. The defendant could have asked his ex-wife directly if she was biased, and whether she hated the defendant, wanted to see him suffer, or would lie to see him punished. These would have been fair, relevant questions that would have allowed the jury to assess his ex-wife's credibility with respect to the issue of bias without distracting the jury with irrelevant details concerning her love life.

That many of these questions, and others like them, were not asked by defense counsel is glaring omission. The defendant states that the right to explore a witness for bias is a fundamental right and insinuates (without directly asserting) that the restriction of this right – created by the trial court's sustaining of the State's objection to his question – violated his right to confrontation under the Sixth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution. *See State v. Sayles*, 49 S.W.3d 275, 279 (2001). However, in light of his failure to make any meaningful effort to establish bias by

more direct and proper questions, we will not hold that the defendant's right to confrontation was unconstitutionally curtailed.

## IV.

Lastly, the defendant claims that his conviction should be reversed because, during closing rebuttal argument, the State's attorney "thanked" the defendant's counsel for "doing an excellent job in this case because he does what he gets paid to do and that's . . . to get [his client] off." While our supreme court has observed that "closing argument is a valuable privilege that should not be unduly restricted," it has also made clear that a prosecutor should not engage in "derogatory remarks." *State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005). However, "prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." *Id.*

We agree with the defendant that the prosecutor's comments were inappropriate. The defendant is correct that it is the job of defense counsel, just as much as the prosecutor, to ensure that the defendant receives a fair trial, that his constitutional rights are protected, and that the finder of fact is presented with all of the relevant evidence in an honest and fair manner. Quite simply, the prosecutor should not have stated that it was the job of the defendant's counsel to "get" him "off"; the sarcasm of his ostensible expression of gratitude toward opposing counsel virtually oozes off the pages of the transcript. Whether this inappropriate remark reaches the level of full-blown legally-cognizable prosecutorial misconduct, however, is an issue that we need not reach, because the defendant has not established prejudice on the facts of this case.

In conducting our assessment of whether a defendant has established prejudice, "we must consider: (1) the conduct complained of viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case." *Id.* Two of these five factors weigh in the defendant's favor. The prosecutor's intent in making the improper comment cannot have been benign; at best, it was intended to belittle opposing counsel, and, at worst, it was meant to distract the jury from the matters properly before it by focusing the jury's attention on the defense counsel's credibility instead of the credibility of the witnesses. Moreover, the trial court missed an opportunity to take a curative step when it overruled the defendant's objection rather than sustaining it (although the prosecutor did modestly mitigate the damage done by immediately switching the discussion to proper topics after the objection was interposed).

However, the remaining three factors weigh against a finding of prejudice and

strongly outweigh the two factors discussed above. The conduct complained of constituted but a single sentence uttered over the course of a three-day trial. There do not appear to have been any other instances of arguable prosecutorial misconduct or other such errors (that might have created a "cumulative effect" when combined with this single remark) committed over the course of the three-day trial. Most importantly, the case against this defendant was extremely strong. This defendant confessed, and his confession was supported by the testimony of numerous witnesses who established that (1) the victim had been sexually assaulted and (2) the defendant was the only one who was alone with the victim during the time period in which that assault must have occurred. In light of this evidence, we conclude that the defendant cannot establish that the prosecutor's inappropriate remark affected the jury's verdict to his prejudice. The defendant's claim is therefore denied.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE